UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| STATE FARM FIRE & CASUALTY COMPANY, | ) ) ) | |
| Plaintiff, | ) ) ) | CASE NO. 2:11-CV-00303-WCL-APR |
| v. | ) ) | |
| JOHN CASTILLO, VERONICA CASTILLO and RUBEN CASTILLO | ) ) ) | |
| Defendants. | ) | |

## OPINION AND ORDER

On May 16, 2009, Defendant Ruben Castillo ("Ruben") was shot four times by Defendant

John Castillo ("John") while a guest in John's home. Subsequently, Ruben sued John and John's

wife, Veronica Castillo ("Veronica") (collectively, "the Castillos")[1] in Indiana state court seeking

damages for his injuries. In the present declaratory judgment action, State Farm, the Castillos's

homeowner's insurance carrier, seeks a judgment declaring that its policy does not cover Ruben's

claims for damages arising out of the shooting incident.

Currently before the Court is State Farm's Motion for Summary Judgment [DE 23] as well

as State Farm's Motion to Strike [DE 37]. The Defendants responded to both motions to which State

Farm replied. For the following reasons, summary judgment will be GRANTED. The Motion to

Strike will be DENIED as MOOT.

## FACTUAL BACKGROUND

---

[1]John, Veronica and Ruben Castillo are all defendants in this declaratory judgment action and have filed identical briefs opposing State Farm's Motion for Summary Judgment in this action. When referenced herein, they will be collectively known as "the Defendants."

The facts are largely undisputed[2] and are as follows:

On May 15, 2009, Ruben, John's cousin, visited the Castillos around 8:30 p.m.[3] Ruben frequently visited John's residence as the two had a close relationship. John had been drinking before Ruben arrived and the two continued to drink alcohol and play video games in the basement.

John has a gun safe in the basement of his home located next to a dart board. John, a military veteran, only kept guns in the safe and, Ruben believed that the guns were unloaded. However, as the night progressed, at some point, John left the basement and went upstairs. Around 11:00-11:30 p.m. Ruben walked upstairs and saw John holding a rifle and talking with Veronica. Ruben believed there was some sort of argument between the two. Ruben then asked John to give him the rifle and John complied. Ruben then gave the rifle to another family member who secured it.

Eventually, Ruben and John returned to the basement and Ruben began asking John about what had just occurred upstairs. John did not respond. Around 12:30 a.m. on May 16, 2009, John retrieved a pistol from the gun safe, pointed it at Ruben and shot him four times: twice in the left arm, once in the left side of his abdomen, and once in his thigh. John was eventually arrested, and charged with four criminal counts. He pled guilty to criminal recklessness for the shooting.

At his plea and sentencing hearing, John admitted to the Court that on the morning of May 16, 2009, he went to the gun safe in his house, took a pistol out of the safe, pointed it at Ruben and shot him four times. (DE 25-7, Exh. E, p. 7). He further admitted that he did so "knowingly, intentionally, or recklessly." He responded affirmatively when the judge stated that John's state of

---

[2]None of the Defendants submitted a Statement of Material Facts nor do they appear to contest the facts set out by State Farm. They do contest the import of those facts on the law applicable to the case as demonstrated by the Discussion section, infra.

[3]On this same day, Ruben had originally been at the Castillos's house around 4:00 or 5:00 p.m. He left and returned around 8:30 p.m.

intoxication was not so great as to prevent him from opening his gun safe, getting the weapon, and

hitting his target.  (*Id.* at p. 8).   Ultimately, the judge accepted his plea agreement and sentenced

him to a 3 year sentence with all but 12 days suspended.

In his deposition, however, John provides a different story relating to the shooting.  In

particular, he asserts that he believes he suffered from an alcohol induced blackout and that he did

not intend to shoot Ruben, rather, he aimed at a dart board, missed and accidentally shot Ruben.

> Q. Do you recollect or do you know whether or not you had a blackout this particular evening?
> A. I think I did.
> Q. And as part of your counseling have you undergone any therapy sessions?
> A. Yes.
> Q. With a clinical therapist of some type?
> A. Yes.
> Q. Do you know what your therapist's name is?
> A. No.
> Q. Has it helped you in any way to remember any of this or...
> A. Yes. That's - - I kind of stopped going because of that.
> Q. So when you started to remember it was emotionally overwhelming for you?
> A. Yes.
> ...
>
> Q. So when you were talking to her about the incident did you start to have memories coming back?
> A. Yes.
> Q. Did either of these therapists discuss with you the fact that you were blacked out during this incident?
> A. Yes.
> Q. And was it their opinion of did they believe also that you were subjected to a blackout when this occurred?
> A. Yes.
> Q. And when I say blackout, just so we're clear, what's your understanding of an alcohol-induced blackout?
> A. When you can't remember what happened, events prior.
> Q. Okay. So when you're still functioning but you have no memory or cognitive ability to remember is that it?
> A. Yes.
> Q. Basically?
> A. Yes.

Q.       Okay. Well then, what, if any memories resurfaced or were you able to grasp as a result of this therapy?
A.       As in?
Q.       Well, about the shooting. What do you remember about that?
A.       Him bleeding.
Q.       Well, I mean, okay.
A.       Oh. That's - -
Q.       Let me back up. Prior to him bleeding do you have any recollection of how it was he was shot or you began shooting?
A.       Right. I...Like I said, for me it was - - I was aiming at the dart board.
Q.       Okay, Well, and I've seen some rough diagrams of your dart board. Let me ask you this. To your recollection the memories that have now resurfaced, was Reuben standing in close proximity to the dart board?
A.       Yes.
Q.       And your recollection is that you were firing at the dart board?
A.       Yes.
Q.       And your belief was you could hit the dart board?
A.       Yes.

[Defendant's Designations of Evidence, Exhibit B, pp. 16-19 (emphasis added) *see also* docket 31 and 33 Defendants' respective Responses Docket 31, pp. 5-8. Docket 33, pp. 4-8.].  State Farm has moved to strike portions of the above testimony, in particular, the portions wherein John indicates his therapists believed he suffered from a blackout claiming that it is inadmissible hearsay not subject to any hearsay exception.

At the time of the shooting, the Castillos were insured under a policy of homeowner's insurance ("the Policy") issued by State Farm which provided coverage consistent with its terms, conditions, and exclusions.  (DE 25, Exh. A).  The Policy provides personal liability coverage and medical payments coverage for damages because of bodily injury ... caused by an "occurrence." (Policy, Section II, Coverage L and M).  The Policy defines an "occurrence" as "an accident ... which results ... in bodily injury..." (Policy, Definitions, p. 2).  Section II of the Policy further contains several exclusions from coverage, including an exclusion for intentional acts caused by the insured:

Coverage L and Coverage M do not apply to:
a.       bodily injury or property damage
          (1) which is either expected or intended by the insured; or
          (2) which is the result of willful and malicious acts of the insured.

(Policy, Section II Exclusions, p. 16).

In light of these Policy provisions, State Farm filed the instant action seeking a declaration

that State Farm also contends that the incident does not qualify as an "occurrence" under the Policy.

Specifically, State Farm asserts that since John admitted in his criminal proceedings that he

committed an intentional act against Ruben, he is judicially estopped from claiming otherwise in the

present litigation.  As a result, State Farm argues, coverage for Ruben's injuries under the Castillos's

homeowners policy does not qualify as an occurrence and/or is excluded under the intentional acts

exclusion. The Defendants, however, assert that there are genuine issues of material fact as to

whether John's actions toward Ruben were intentional.

## APPLICABLE STANDARD

Summary judgment is proper when "the pleadings, the discovery and disclosure materials

on file, and any affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P 56(c)(2). A genuine issue of

material fact exists if "the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d

202 (1986). In determining summary judgment motions, "facts must be viewed in the light most

favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v.*

*Harris,* 550 U.S. 372, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007). The party seeking summary

judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp.*

*v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). After "a properly supported

motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.' " *Anderson,* 477 U.S. at 255 (quoting Fed R. Civ. P. 56(e)).

## DISCUSSION

As set forth above, this case centers around the exclusion of insurance coverage in the Policy under what is commonly known in insurance parlance as the "intentional acts exclusion."

State Farm contends that John's admission during his plea hearing that he shot Ruben is sufficient evidence of an intentional act to preclude coverage under the Policy. The Defendants, however, assert that there is a genuine issue of material fact as to whether John's actions were intentional or accidental and thus, whether the Policy's intentional act exclusion applies cannot be resolved on summary judgment.

Because an insurance policy is a contract for insurance, it is governed by the same rules of construction as other contracts. *Briles v. Wausau Ins. Cos.,* 858 N.E.2d 208, 213 (Ind.Ct.App.2006) (citing *Gregg v. Cooper,* 812 N.E.2d 210, 215 (Ind.Ct.App.2004). As with other contracts, their interpretation is a question of law. *Briles,* 858 N.E.2d at 213.

When interpreting an insurance policy, the goal is to ascertain and enforce the parties' intent as manifested in the insurance contract. *Id.* In reviewing policy terms, the court construes them "from the perspective of an ordinary policyholder of average intelligence." *Allgood v. Meridian Sec.Ins.Co.,* 836 N.E.2d 243, 246-47 (quoting *Burkett v. Am. Family Ins. Group,* 737 N.E.2d 447, 452 (Ind.Ct.App.2000)). Where an ambiguity exists, that is, where reasonably intelligent people may interpret the policy's language differently, courts construe insurance policies strictly against the insurer. *See Fidelity and Deposit Co. of Md. v. Pettis Dry Goods Co.,* 207 Ind. 38, 42 (1934) ( "any

doubts or ambiguities must be resolved most strongly against" the insurer).[4] This is particularly the

case where a policy excludes coverage. *Am. States Ins. Co. v. Kiger,* 662 N.E.2d 945 (Ind.1996). At

the same time, interpretation should harmonize the policy's provisions rather than place its

provisions in conflict. *Allgood,* 836 N.E.2d at 247.

Here, coverage under the Policy is triggered by an "occurrence."  Specifically, the relevant

portion of the insuring agreements  provide  as follows:

> If a claim is made or a suit is brought against an **insured** for damages because of
> **bodily injury** or **property** damage to which this coverage applies, caused by an
> **occurrence**, we will:
>
> > 1.    pay up to our limit of liability for the damages for which the insured
> >       is legally liable ...[5]

An "occurrence" is defined as "an accident, including exposure to conditions which results,

during the policy period, in....bodily injury or ...property damage."  The policy does not further define

"accident" but, in the context of insurance coverage, Indiana law states that "an accident means an

unexpected happening without an intention or design." *Indiana Farmers Mut. Ins. Co. v. North Vernon*

*Drop Forge, Inc.* 917 N.E.2d 1258, 1271 (Ind. Ct. App. 2009) (quoting *Terre Haute First Nat'l Bank,*

634 N.E.2d at 1336).

According to State Farm, insurance coverage is not authorized for the Castillos because no

"occurrence" i.e., no accident, occurred.  State Farm argues that John's act of shooting Ruben was not

---

[4]Strict construction against the insurer derives from the disparity in bargaining power
characteristic of parties to insurance contracts. *Wagner v. Yates,* 912 N.E.2d 805, 810 (Ind. 2009). "The
insurance companies write the policies; we buy their forms or we do not buy insurance." *Id.* at 811
(quoting *Kiger,* 662 N.E.2d at 947). Nevertheless, we enforce limits on coverage where the policy
unambiguously favors the insurer's interpretation. *See Allgood,* 836 N.E.2d at 246-48 (holding that "loss"
did not include coverage for diminution of value where automobile was repaired despite differences
among courts' interpretations of similar or identical provisions).

[5]The Policy also contains an obligation to defend the insured in such cases.

accidental, as evidenced by his guilty plea to criminal recklessness, and thus, any injuries flowing to Ruben as a result of John's conduct do not fall within the scope of the policy's insuring clause.

Generally, "insurers are free to limit coverage; however, all exceptions, limitations and exclusions must be plainly expressed. An exclusionary clause must clearly and unmistakably express the particular act or omission that will bring the exclusion into play." *Wells v. Auto Owners Ins. Co.,* 864 N.E.2d 356, 358 (Ind.Ct.App.2007) (citing *Jackson v. Jones,* 804 N.E.2d 155, 158 (Ind.Ct.App.2004)).

Here, State Farm notes that the Policy also provides a specific exclusion for "bodily injury or property damage...(1) which is either expected or intended by the insured; or (2) which is the result of willful and malicious acts of the insured." (Policy, p. 16). Because John admitted to intentional conduct in his criminal proceeding, State Farm argues that John cannot now claim that his conduct was accidental so as to trigger Policy coverage.

The Castillos cite to *Bolin v. State Farm Fire and Casualty Company*, 557 N.E.2d 1084 (Ind.Ct.App. 1990) for the proposition that John's guilty plea alone does not foreclose him from asserting that he acted accidentally in shooting Ruben. In *Bolin*, a case interpreting the intentional acts exclusion, the court concluded that the insured's act of shooting a pellet gun at the rear of the victim's truck was not intentional as a matter of law because the injury to the driver of the truck was not "practically certain to occur" as a result of a conscious act by the insured. *Bolin,* 557 N.E.2d at 1086. There, the insured stated that he aimed for the rear of the truck rather than at the victim, injured the victim, and then pled guilty to criminal recklessness, just as John did here. The court concluded that the guilty plea did not foreclose the insured because:

> [E]xpectation that injury is practically certain to occur cannot as a matter of law be inferred from a plea which admits a disregard for safety. The latter speaks to the concept that the person does not care whether injury might result. That is different from an awareness that injuries are practically certain to occur.

*Bolin*, 557 N.E.2d at 1088.

State Farm, however, downplays *Bolin* and asserts that other Indiana cases have addressed the meaning of expected or intended exclusionary provisions like the one at issue here in different terms. "Intentional" has been defined by the Indiana Supreme Court as "the volitional performance of an act with an intent to cause injury, although not necessarily the precise injury or severity of damage that in fact occurs." *Allstate Ins. Co. v. Herman,* 551 N.E.2d 844, 845 (Ind.1990) (quotation omitted) (holding that when insured intentionally fired a gun into a fleeing crowd, he was deliberately committing an act any reasonable person would deem calculated to cause injury and, therefore, policy exclusion for intentional acts applied); *Home Ins. Co. v. Neilsen,* 332 N.E.2d 240, 244 (Ind.Ct.App.1975) (intent to cause injury may be established by showing actual intent to injure or by showing the nature and character of the act to be such that intent to cause harm to the other party must be inferred as a matter of law).

Having reviewed the cases cited by the parties, the Court concludes that the incident here does not qualify as an "occurrence" and, even if it did, the intentional acts exclusion precludes coverage for the bodily injuries sustained by Ruben. *Allstate Ins. Co. v. Norris,* 795 F.Supp. 272 (S.D.Ind.1992) is particularly instructive when viewed in light of the present facts. In that case, the court concluded that no "accident" occurred and thus, there was no "occurrence" triggering a duty to defend where the insured fired several shots in an attempt to "pin down" an unidentified man, but struck a passerby instead. At issue there was whether an insurer was liable under a homeowner's policy for damages sustained by a bystander shot by the insured as he attempted to "pin down" an assailant until law enforcement arrived. *Norris,* 795 F.Supp. at 273. The homeowner's policy provided that the insurer would pay for damages arising from an "accident," but the term was not defined in the policy. *Norris,*

9

795 F.Supp. at 274. In deciding whether the insurer was liable under the policy, the court noted the distinction "between an event that is unexpected or unintended (which is an accident), and an event or act that is intended, but causes unexpected consequences (which is not)." *Id*. at 275. The court said that "a volitional act—which is always intended—does not constitute an accident, even where the results may be unexpected or unforeseen." *Id.* The court concluded that the plaintiff's injuries did not result from an accident and, therefore, were not covered under the policy. The court said this conclusion applied even if the insured did not intend to hit anyone in particular because "it is undisputed that [the insured] meant to fire his gun, and that he meant to fire it in the direction of the house where [the bystander] was standing. [The insured's] actions therefore were volitional, and clearly not accidental, whether or not their consequences were unforeseen." *Id.*

Applying the holding in *Norris* in this case leads to the conclusion that the injury to Ruben was not accidental. In his guilty plea, John specifically admitted that he went to the gun safe, removed the pistol from the safe, pointed it at Ruben and shot him four times. Regarding his state of intoxication, John affirmatively indicated that he was not so inebriated to prevent him from opening the safe, getting the pistol and hitting his target.[6] John's deposition testimony indicates that he retrieved the gun,

---

[6]John attempts to assert his state of inebriation as a defense to the voluntariness of his acts. This is a red herring. In *Allstate Ins. Co. v. Wiley,* 2010 WL 381608, 4 (S.D.Ind., 2010), the defendant made a similar assertion that he was intoxicated at the time of the incident giving rise to the injury. The Court concluded that the fact of intoxication was irrelevant and did not refute the insured's clear admissions and that intent may be inferred from the conduct itself:

> Wiley attempts to cloud his admitted intent and expectations by pointing out that he was inebriated at the time of the incident. This is not, however, relevant, as it does not refute his clear admissions. Moreover, even if he hadn't admitted this intent, such intent also may be inferred from the "nature and character" of his conduct. *Home Ins. Co. v. Nielsen,* 165 Ind.App. 445, 332 N.E.2d 240, 244 (Ind.Ct.App.1975); *see also Harvey,* 842 N.E.2d at 1290.

Here too, the fact of John's inebriation does not refute his admissions that he intended to fire the pistol in

10

voluntarily and intentionally fired it in the direction of Ruben but was aiming at the dart board and not at Ruben. Regardless of which version of events the court considers, it is undisputed that John has admitted the act of retrieving the weapon and intentionally firing it in the direction of where Ruben (and apparently the dart board) were located.[7] *See also, State Farm v. Henderson*, 2002 WL 1354719 (S.D. Ind. 2002) (insured's act of intentionally firing a weapon and killing the decedent was not accidental since undisputed facts showed that insured intended to pull the trigger, pulled the trigger, and discharged the bullets that struck and killed decedent). Thus, the incident cannot be said to be accidental so as to qualify as an "occurrence" triggering insurance coverage.

Likewise, even if the incident could fall within the definition of "occurrence" cases interpreting the intentional acts exclusion have held that an inference of intent to harm can be inferred from the nature of the act itself. In *Allstate Ins. Co. v. Herman,* 551 N.E.2d 844, 845 (Ind.1990), the Indiana Supreme Court concluded that the insured's act of deliberately firing four shots into crowd of fleeing people fell within intentional acts exclusion of homeowners' policy, even if insured did not intend to shoot the person he in fact hit. The court determined as a matter of law that the insured's act of firing the shots fell within the intentional acts exclusion because "the word intentional 'refers instead to the volitional performance of an act with an intent to cause injury, although not necessarily the precise injury or severity of damage that in fact occurs.'" (quoting *Home Insurance Co. v. Neilsen*, 332 N.E.2d at 242).

Here, the intentional act of firing the rifle in a room where people were present is sufficient to infer intentional conduct. Again, as with whether the incident could be deemed an "occurrence," it

---

the direction where Ruben was located.

[7]Because it is irrelevant to the underlying analysis which version of events leading to the shooting the Court considers, the Motion to Strike is DENIED as MOOT.

matters little whether John intended that Ruben be shot. John has admitted voluntarily and intentionally firing a rifle inside a home where others were present. While John's most recent statements indicate he may have intended to hit the dart board and not Ruben, this fact is insufficient to raise a genuine issue of material fact as to intentional conduct under Indiana law.

Accordingly, as the material facts are not in dispute, State Farm is entitled to judgment as a matter of law that the incident is not an "occurrence" and thus not a covered loss under the State Farm homeowner's policy issued to the Castillos. Similarly, even if the incident was an "occurrence" triggering coverage, the incident is excluded under the intentional acts exclusion in the policy.

## CONCLUSION

Based on the foregoing, State Farm's Motion for Summary Judgment [DE 23] is GRANTED. The Motion to Strike [DE 37] is DENIED as moot.

Entered: March 18, 2013

s/ William C. Lee
United States District Court